Linda PLACE, Plaintiff,

v.

**ABBOTT LABORATORIES, INC. and Lake–Cook Psychologists and Counseling Associates, Defendants.**

No. 94 C 5491.

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 3, 1996.

Linda Place, Waukegan, IL, pro se Plaintiff.

Kenneth D. Breisman, The Office of General Counsel, Abbott Laboratories, Inc., Abbott Park, IL, Hubert O. Thompson, Carney & Brothers, Chicago, IL, for Defendant Abbott Laboratories, Inc.

Randy Sue Schreiber, Querrey & Harrow, Ltd., Chicago, IL, for Defendant Lake–Cook Psychologists and Counseling Associates.

COAR, District Judge.

The court adopts in its entirety the report and recommendation of Magistrate Judge Morton Denlow, dated May 2, 1996. Defendant Abbott's motion for partial summary judgment [Doc. 103–1] is granted as to Counts I, II, and III, and denied as to Count IV.

DENLOW, United States Magistrate Judge.

### REPORT AND RECOMMENDATION

Plaintiff Linda Place ("Plaintiff") has filed a five-count *pro se* amended complaint against defendants Abbott Laboratories, Inc. ("Abbott") and Lake–Cook Psychologists and Counseling Associates ("Lake–Cook"), arising out of Plaintiff's employment and termination at Abbott. Abbott is a party to all five counts. Lake–Cook is a party only to

Count III [1]. In Count I, Plaintiff alleges that Abbott discriminated against her in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. ("ADA"), by requiring her to undergo an independent medical examination ("IME") prior to permitting her to return to work from her disability leave. In Count II, Plaintiff alleges that Abbott breached its duty under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq. ("ERISA") by failing to fully and fairly review her appeal of benefits denial and by allowing an Abbott employee, Robert N. Beck, to review her benefits denial. In Count III, Plaintiff alleges that Abbott interfered with her rights under the ERISA by refusing to arrange for a required medical examination to be administered by a capable medical practitioner. In Count IV, Plaintiff alleges that Abbott discriminated against her on account of her sex in violation of the Civil Rights Act of 1991, 42 U.S.C. § 1981(a), Title VII and Section 704(a) of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., as amended, claiming Abbott knew or should have known about acts of sexual harassment and intentionally failed to take appropriate remedial action. Count V is a cause of action for retaliation under Title VII. Abbott has filed a motion for summary judgment to Counts I, II, III, and IV. For the reasons set forth below, the Court should grant Abbott's motion for summary judgment as to Counts I, II, and III and should deny Abbott's motion as to Count IV.

## I. FACTUAL BACKGROUND

Plaintiff was employed by Abbott from February 25, 1986 to November 17, 1992. (Abbott's Statement of Material Facts (hereinafter "12(M)" ¶¶ 3, 39.)) While employed by Abbott, Plaintiff was a participant in the disability plan under ERISA. (Plaintiff's Complaint (hereinafter "Comp." ¶ 6.))

Plaintiff complained to the Abbott Human Resources Department of sexual harassment by her supervisor in July, 1991. (Plaintiff's Response to Abbott's Motion for partial Summary Judgment Statement of Material Facts (hereinafter "12(N)" ¶ 13)). Abbott responded to Plaintiff's complaints by requiring all interaction and communication between Plaintiff and her supervisor to be handled by an intermediary (12(M) ¶ 14). Subsequently, in December of 1991 (12(M) ¶ 14), Plaintiff took a disability leave of absence from Abbott due to depression and post-traumatic stress disorder. (12(M) ¶ 18). Following her disability leave, Plaintiff was released by her therapist to return to full work duties on May 15, 1992. (12(M) ¶ 19.)

On May 18, 1992, Dr. Brockton L. Weisenberger, Director of Corporate Employee Health at Abbott, and other Abbott employees decided that additional medical information regarding Plaintiff's mental state was necessary based on a concern that Plaintiff may be a danger to herself or others. (Def.Ex.F. 55).

On May 19, 1992, Lake–Cook agreed to perform and administer an IME of Plaintiff pursuant to a provider agreement between Lake–Cook and CNR Health, Inc., a non-party, who is the managed care provider for Abbott employees (Lake Cook Ans. ¶ 36). A variety of psychological testing and a therapy session was to be included in the examination. Plaintiff did not keep her first scheduled appointment on June 12, 1992. Dr. Weisenberger then met with Plaintiff and informed her that if she did not submit to an IME she would be terminated. (Def.Ex.D. 23). This discussion was followed by a letter to Plaintiff from Dr. Weisenberger dated June 12, 1992, informing her again that "if you fail to follow through with the independent medical examination, you will be ineligible to stay on disability leave of absence and continue receiving benefit payments. Further it will be assumed that you have resigned." *Id.*

On June 15, 1992, Plaintiff wrote to Dr. Weisenberger indicating that she "was threatened with separation of employment from Abbott if [she] did not comply with [Abbott's] request for an IME." Plaintiff went on to state that she was aware that the

---

1. On April 24, 1996, this court issued its Report and Recommendation that summary judgment

be granted in favor of Lake–Cook on Count III.

request for an IME was "a stipulation of the disability policy." *Id.* On August 20, 1992, Plaintiff came into Lake–Cook's offices and met with Dr. John D. Jochem, a clinical psychologist, for the purposes of submitting to a mental status examination as requested by Abbott. (12(N) ¶ 72). At that meeting, Plaintiff insisted on tape recording the mental status examination and any oral psychological testing which was to be administered. *Id.* Dr. Jochem would not allow Plaintiff to tape record the examination, and Plaintiff declined to proceed with the examination unless she was allowed to tape record. *Id.* The examination was terminated. *Id.*

After Plaintiff left Lake–Cook's offices, Dr. Jochem telephoned Dr. Weisenberger and informed him of Plaintiff's refusal to participate in the IME without tape recording. Dr. Jochem informed Dr. Weisenberger that he was still willing to conduct a medical examination of Plaintiff, however, he was unwilling to do so if tape recorded. (12(M) ¶ 37).

Abbott did not reinstate Plaintiff because she failed to complete an IME. (12(M) ¶ 38). Abbott terminated Plaintiff on November 17, 1992 because she exhausted the maximum disability leave of absence allowed under Abbott's policy. (12(M) ¶ 39).

## II. SUMMARY JUDGMENT STANDARD

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *Celotex Corporation v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2554–55, 91 L.Ed.2d 265 (1986). This standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues. *Sarsha v. Sears Roebuck & Co.,* 3 F.3d 1035, 1038 (7th Cir.1993).

When reviewing the record on summary judgment, the court must draw all reasonable inferences in the light most favorable to the nonmovant. *Hill v. Burrell Communications Group, Inc.,* 67 F.3d 665, 667 (7th Cir.1995). To avert summary judgment, however, plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). A dispute about a material fact is genuine only if the evidence presented is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A summary judgment proceeding is not a vehicle for the resolution of factual disputes; it is designed to determine whether there is any material dispute of fact that requires a trial. *Id.*

## III. ADA ANALYSIS

■ Plaintiff's ADA claim under Count I is barred because the alleged discriminatory act occurred before the effective date of the ADA. The Americans with Disabilities Act became effective on July 26, 1992. 42 U.S.C. § 12111 note—Effective Date. *See* Pub.L. No. 101–336, § 108, 104 Stat. 327, 337 (1990). The Act was not retroactive. *Graehling v. Village of Lombard,* 58 F.3d 295, 296 (7th Cir.1995); *O'Bryant v. City of Midland,* 9 F.3d 421, 422 (5th Cir.1993). In order for there to be liability under the ADA, the alleged discriminatory act must have occurred after the Act's effective date of July 26, 1992. 42 U.S.C. § 12111. *Graehling v. Village of Lombard,* 58 F.3d 295, 296 (7th Cir.1995).

■ The ADA states in relevant part:

No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions and privileges of employment. 42 U.S.C. § 12112(a).

The alleged discriminatory act was Abbott's requirement that Plaintiff submit to an IME before her reinstatement. (Am.Comp. ¶¶ 21, 22, 25 and 29.) Abbott asserts that Plaintiff's claim is barred because the request for

the IME occurred before the effective date of the ADA. Plaintiff maintains that the request was a continuing violation of the ADA and is therefore not barred.[2]

Abbott notified Plaintiff that she would be required to complete an IME as a condition of returning to work prior to the effective date of the ADA. On May 19, 1992, Dr. Chelle Dainas notified Plaintiff that Abbott was requiring an IME. (Def.Ex.D. 23). On June 12, 1992, Dr. Brock Weisenberger, Abbott's Director of Corporate Employee Health, sent a letter to Plaintiff informing her that "if you fail to follow through with the independent medical examination, you will be ineligible to stay on disability leave of absence and continue receiving benefit payments. Further, it will be assumed that you have resigned." (Def.Ex.D. 22). On June 15, 1992, Plaintiff wrote to Dr. Weisenberger indicating that she had received his June 12 letter, and she understood that she "was threatened with separation of employment from Abbott if [she] did not comply with [Abbott's] request for an IME. [She was] also aware it is a stipulation of the disability policy." (Def.Ex.D. 23.) Plaintiff acknowledges that she was warned of the impending termination should she fail to submit to an IME, and that the request for an IME was part of Abbott's policy.[3] *Id.*

In *Delaware State College v. Ricks,* 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980)[4] and *Chardon v. Fernandez,* 454 U.S. 6, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981), the plaintiffs were denied tenure and given one year terminal contracts. In effect, the operative decisions were made, and notice given, in advance of a designated date on which their employment terminated. The Court held that in considering whether a continuing violation existed, "[t]he proper focus is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts become most painful." *Ricks* at 258, 101 S.Ct. at 504. Also, "[t]he emphasis is not

upon the effects of earlier employment decisions; rather it 'is [upon] whether any present violation exists.' " *Id.*

■ *Graehling v. Village of Lombard, Illinois,* 58 F.3d 295, 296 (7th Cir.1995), is directly on point. In *Graehling,* the court held "that a separation at a time established by an earlier decision is *not* a fresh act of discrimination" under the ADA. "Only the original decision to let the employee go is subject to analysis under the anti-discrimination laws." *Id.* In *Graehling,* the plaintiff police officer brought an action under the ADA alleging that he was coerced into resigning because of his alcoholism, depression and post-traumatic stress syndrome. Prior to the effective date of the ADA, Graehling submitted his resignation which was to become effective after the effective date of the ADA. Nine days before his scheduled departure, Graehling sought to rescind his resignation claiming that once the ADA took effect, the Village could not enforce his resignation. Plaintiff claimed two ADA violations: extracting the resignation and implementing it. The first took place before the ADA and was not illegal. The court held that the second claim was also barred by the line of cases holding "that a separation at a time established by an earlier decision is *not* a fresh act of discrimination."

In the case at bar, Plaintiff contends that the decision to require her to submit to an IME violated the ADA as did the ultimate decision not to reinstate her. As previously discussed, the IME requirement was imposed prior to the effective date of the ADA. The fact that the consequence of that decision was not felt until after the effective date of the ADA is irrelevant under the *Graehling* analysis.

Similarly, the Seventh Circuit has held that where a single discriminatory act results in a later adverse action the limitations period begins with the initial decision. *See Palmer v. Board of Education,* 46 F.3d 682,

2. The court does not decide whether the request for an IME violates the ADA as Plaintiff's claim is time barred.

3. All the discussion and correspondence occurred prior to the effective date of the ADA. As such, even giving Plaintiff the last possible date,

as we must, her claim still does not fall under the purview of the ADA.

4. While most of the authority cited are Title VII cases, they apply by analogy to the ADA. *See* 42 U.S.C. § 12117(a).

685–86 (7th Cir.1995) (when there is only one wrongful act the claim accrues with the first injury.); *Lever v. Northwestern University,* 979 F.2d 552, 556 (7th Cir.1992) (when a single discriminatory decision is taken, communicated, and later enforced the time starts with the initial decision).

Plaintiff's reliance on *Bazemore v. Friday,* 478 U.S. 385, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986) is misplaced. *Bazemore* did not involve a separation from employment based on an earlier decision. Rather, it dealt with a situation in which unequal pay continued after adoption of The Civil Rights Act of 1964, 42 U.S.C. § 2000(e), et seq.

Plaintiff also relies upon *Smith v. United Parcel Service of America, Inc.,* 65 F.3d 266 (2nd Cir.1995) for the proposition that her claim is not barred because she did not receive a definite notice of termination. The court in *Smith* held that the limitation period begins to run "on the date when the employer receives a definite notice of the termination." The court further stated that "for the notice to be effective it must be made apparent to the employee that the notice states the official position of the employer." *Id.* at 268. Plaintiff received definite notice on several occasions prior to the effective date of the ADA on July 26, 1992.

As a result, Abbott is entitled to judgment as a matter of law on Plaintiff's ADA claim.

## IV. ERISA ANALYSIS

### A. Duty to Fairly and Fully Review Plaintiff's Request for Benefits

Abbott is entitled to summary judgment on Plaintiff's ERISA claim because under an arbitrary and capricious standard, Abbott fairly and fully reviewed Plaintiff's denial of benefits. In Count II, Plaintiff claims that Abbott violated ERISA by affirming the imposition of additional requirements not found in the disability plan (the "Plan"), and by designating Robert Beck, Senior Vice President of Human Resources, as the person to perform the review of the denial of benefits.

For review of a denial of coverage under a health and welfare plan, the arbitrary and capricious standard applies.[5] *Kraut v. Wisconsin Laborers Health Fund,* 992 F.2d 113 (7th Cir.1993). According to this standard,

> [a decision of a fiduciary] would be arbitrary and capricious if the [fiduciary] relied upon factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before [it], or is so implausible that it could not be ascribed to a difference in view or the product of [its] expertise. *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co.,* 463 U.S. 29, 42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983).

Abbott has not breached any duty owed to Plaintiff under ERISA. Plaintiff alleges that Abbott breached its duty to provide a full and fair review of the decision to deny her benefits by affirming the imposition of additional requirements not found in the disability plan, and by designating Robert Beck, Senior Vice President of Human Resources, as the person to perform the review of the benefits denial. The court will address each argument in turn.

Plaintiff points to two additional requirements that she was subjected to which are not part of the plan. The first is requiring the plaintiff to submit to an IME with Dr. Jochem. The second is Abbott's refusal to allow her to tape record the IME.

### B. The IME Requirement is Found in the Plan

The requirement to submit to an IME as a condition for continued benefits is expressly stated in Abbott's disability plan. Abbott's Personnel Policy No. 184, "Disability Leave of Absence," states unequivocally that "[e]mployees on disability leave of absence will be required to obtain an independent medical evaluation if requested by the

---

5. The case cited by plaintiff urging the court to use a *de novo* standard do not apply to the case at bar. *Firestone Tire & Rubber v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) was specifically limited to § 1132(a)(1)(B) of ERISA, a violation of which has not been asserted by the Plaintiff.

Company." (Albert Aff.Ex. 1 Policy No. 184, p. 1). Also, Abbott Personnel Policy 191 "Temporary Disability Program" requires that the employee submit to an IME when requested by Abbott as a condition of continuing to receive benefit payments. (*Id.* at Policy No. 191, p. 4). Finally, Section 4.7 of Abbott's Extended Disability plan provides, in part, that '[t]he Board of Review, the employer and their agents shall further have the right to direct the employee to submit to an examination by a physician designated by the Board of Review, the employer or their agents." (Trimble Aff.Ex. 1 Extended Disability plan, § 4.7). The requirement to submit to an IME is expressly stated in Abbott's plans and was not an additional requirement outside the plan.

 Neither Abbott's plan nor ERISA provides an obligation to provide a beneficiary with a doctor that will allow the tape recording of an examination. Congress did not intend for ERISA to be manipulated to accommodate the idiosyncrasies of each and every beneficiary. Plaintiff has brought forth no evidence to suggest that Dr. Jochem, a clinical psychologist, was not competent to perform the IME. The fact that Plaintiff would not complete the IME without a tape recorder does not subject Abbott to liability.

### C. Robert Beck's Review of the Decision to Deny Plaintiff Benefits

 There was no breach of an ERISA duty when Robert Beck ("Beck"), the Senior Vice President of Human Resources, reviewed plaintiff's claim. Plaintiff alleges that because Beck supervised Susan J. Smith, the supervisor of North Chicago Benefits, who initially denied Plaintiff's benefits claim, that he had a conflict of interest when reviewing the claim, thereby breaching a duty under ERISA.

Plaintiff asserts that Beck's bias was Abbott's financial interest. The Seventh Circuit has expressly rejected this argument stating: "Were this cause for concern, ERISA would take measures to prohibit corporate officers from serving as plan administrators." *Chalmers v. Quaker Oats Co.*, 61 F.3d 1340 (7th Cir.1995). Several sections of ERISA pro-

vide for the appointment of an employer's own officers to administer a plan. Indeed, § 1133, the provision which plaintiff alleges was violated provides that:

> Every employee benefit plan shall . . . afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review **by the appropriate named fiduciary** of the decision denying the claim. 29 U.S.C. § 1133.

Also, § 1108(c)(3) provides that nothing shall prohibit a fiduciary from "serving as a fiduciary in addition to being an officer, employee, agent, or other representative of a **party in interest.**

The impact on a company's welfare of granting or denying benefits under a plan will not be sufficiently significant as to threaten the administrators' partiality. *Van Boxel v. Journal Co. Employees' Pension Trust*, 836 F.2d 1048, 1051 (7th Cir.1987). (Trustee's denial of benefits not arbitrary and capricious even though Trustees were appointed by Plaintiff's employer.) It simply would be a poor business decision for Abbott to have a practice of resisting claims for benefits. "In the long run, such a practice would dampen loyalties of current employees while hindering attempts to attract new talent." *Chalmers v. Quaker Oats Co.*, 61 F.3d 1340 (7th Cir.1995).

### D. Interference with Plaintiff's ERISA Rights

 Abbott did not interfere with Plaintiff's attainment of ERISA rights. Plaintiff alleges that Abbott interfered with her rights "by wrongfully refusing to arrange for their required medical examination to be administered by a capable practitioner." (Comp. at ¶ 39).

 Interference with ERISA rights is governed by Section 510 of ERISA which provides in relevant part that:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan . . . or for the purpose of interfering with the attainment

of any right to which such participant may become entitled to under the plan.... 29 U.S.C. § 1140.

"The emphasis of a Section 510 action is to prevent persons and entities from taking actions which might cut off or interfere with a participant's ability to collect present or future benefits or which punish a participant for exercising his or her rights under an employee benefit plan." *Tolle v. Carroll Touch, Inc.*, 977 F.2d 1129 (7th Cir.1992).

 Section 510 was designed to protect the employment relationship which gives rise to an individual's pension rights. *Deeming v. American Standard, Inc.*, 905 F.2d 1124 (7th Cir.1990). This means that a fundamental prerequisite to a § 510 action is an allegation that the employer-employee relationship was changed in some discriminatory or wrongful way. *Id.* at 1127. "Typically, a plaintiff alleges either discharge or constructive discharge to satisfy pleading requirements under Section 510." *Eret v. Continental Holding Inc.*, 838 F.Supp. 358 (N.D.Ill. 1993).

 Plaintiff's claim is not properly the subject of § 510. The failure to provide Plaintiff with a "capable practitioner" does not alter the employer-employee relationship. Section 510 was designed to "prevent unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights." *West v. Butler*, 621 F.2d 240, 245 (6th Cir. 1980). Quite the opposite is the situation in this case. Abbott appointed Dr. Jochem to aid the Plaintiff in satisfying the requirements for her reinstatement. Abbott repeatedly made appointments for the Plaintiff so that she could return to work an acquire future benefits under the plan. Notwithstanding Plaintiff's conduct in tape recording Dr. Jochem without his prior agreement, he remained willing to reschedule her IME. (Dr. Jochem dep. at 16.) Furthermore, Abbott did not instruct Dr. Jochem on how to conduct Plaintiff's IME, other than to request objective testing. (Dr. Jochem dep. at 68).

## V. TITLE VII ANALYSIS

 Plaintiff has presented sufficient evidence to entitle her to a trial on her claim of hostile work environment sexual harassment. "When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." *Harris v. Forklift Systems*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). The Seventh Circuit has stated that "sexual harassment by a co-employee is not a violation of Title VII unless the employer knew or should have known of the harassment and failed to take immediate and appropriate corrective action." *Guess v. Bethlehem Steel Corporation*, 913 F.2d 463, 464 (7th Cir.1990) *citing Barrett v. Omaha National Bank*, 726 F.2d 424, 427 (8th Cir.1984).

The Court will discuss the evidence and draw all inferences in the light most favorable to the Plaintiff. Such a discussion should not be deemed to indicate that Plaintiff will ultimately prevail, or that the Court believes that all of the evidence presented is necessarily credible, but rather that under the standards for summary judgment, such an examination of the facts is required.

Plaintiff has presented evidence that she was harassed by her supervisor and co-worker Charles Harrington ("Harrington"). Plaintiff reported several instances to Abbott personnel. Among these were Harrington's miscommunications regarding various procedures, withholding information regarding experiment results, and demeaning the Plaintiff in front of co-workers. (Def.Ex.D. 5–9). While none of these actions are sexual in nature they are sufficient to show a hostile work environment.

Abbott was informed of Harrington's action as they were reported by Plaintiff. Plaintiff was in constant contact with Abbott's personnel department in an attempt to resolve the situation. (Japp Dep. 29–30, 32 Ex. 2–5). Abbott responded by meeting with Harrington and informing him of the Plaintiff's complaints and requiring that all contact with the Plaintiff be through an intermediary. (12(M) ¶ 14). However, this proved

difficult and hampered the Plaintiff's ability to conduct her experiments. Plaintiff, in the interest of completing her experiments requested that she be allowed to communicate directly with Harrington. (12(M) ¶ 15). Soon after Plaintiff's request Harrington began harassing the Plaintiff. (Def.Ex.D. 3–22). As a result of Harrington's actions the Plaintiff's work suffered and there were delays in the project that Harrington and the Plaintiff were working on. *Id.* Plaintiff again complained and Abbott responded by transferring the Plaintiff and Harrington to different projects. *Id.*

Plaintiff has raised a genuine issue of fact as to whether Abbott's response to Plaintiff's sexual harassment claim was reasonable. In *Guess v. Bethlehem Steel Corporation*, 913 F.2d 463, 465 (7th Cir.1990) the court noted that a "remedial measure that makes the victim of sexual harassment worse off is ineffective per se. A transfer that reduces the victim's wage or other remuneration, increases the disamenities of work, or impairs her prospects for promotion makes the victim worse off. Therefore such a transfer is an inadequate discharge of the employer's duty of correction."

Plaintiff was transferred to another division of Abbott and to another project, even though Plaintiff was performing her duties and "was instrumental in minimizing the delays" on her current project. (Franklin Dep. 11–12, 14 Ex. 8 & 12). The delays Plaintiff was minimizing were caused by Harrington's obstinance in providing Plaintiff with the required information for her to complete her work. (Def.Ex.D. 3–22). Also, the position that Plaintiff was transferred to provided less opportunity for the Plaintiff. The new position eliminated Plaintiff's ability to supervise employees and become a team leader on a project. (Pl.Ex.C. 57–61). A reasonable fact finder could infer that Plaintiff's transfer was unnecessary and therefore punitive. The jury could also find that Plaintiff's transfer was the appropriate response by Abbott. This is why we have trials.

Therefore, Abbott's motion for summary judgement as to Count IV should be denied.

## VI. CONCLUSION

For the foregoing reasons, **it is hereby recommended that Abbott's motion for summary judgment be GRANTED as to COUNTS I, II, III and DENIED as to COUNT IV.**

DATE: May 2, 1996.